Circuit Court, E. D. Missouri. March 28, 1879.

[See 9 Fed. 402.]

DOWS (BLAISDELL v.). See Case No. 1,489.

DOWS (BOWKER v.). See Case No. 1,734.

DOWS (CASSEL v.). See Case No. 2,502.

## Case No. 4,048.

### DOWS et al. v. CHICAGO & S. W. RY. CO. et al.

[Trans. Rec. U. S. Sup. Ct. Oct. Term, 1876, p. 10,334.]

Circuit Court, D. Iowa. Aug. 3, 1875.[1]

RAILROAD FORECLOSURES — MISCONDUCT OF TRUSTEES — PARTIES TO CROSS BILLS — GUARANTEE — SUBROGATION — INTERPRETATION AND VALIDITY OF CONTRACTS — ULTRA VIRES.

[1. Mortgage bonds on the main line of a railroad were guaranteed by another company, with a full right of subrogation for any payments made by it. Afterwards a branch line mortgage was given to the same trustees, but the bonds were not guaranteed. The guarantor, having made payments of interest on the main line bonds, caused the trustees to institute a foreclosure suit. Certain branch line bondholders were made parties on their own petition, claiming that their interests were affected, and that their trustees were guilty of bad faith and collusion in bringing the suit. Held, that as these bondholders were thus brought within the protection of the court, which would see that their rights were properly guarded, they could not insist on the alleged misconduct of the trustees as a ground for denying the relief sought.]

[2. At the time the intervening bondholders were made parties to the original bill, cross bills by both the mortgagor and guarantor companies were on file, but the intervenors were not made parties thereto, nor did they ask it. Held, that the proceedings under the cross bills were not invalid on that account, for the intervenors could not be considered as necessary parties thereto, as their trustees, who were parties, represented them.]

[3. Where a guarantor of railroad mortgage bonds is by express stipulation to be subrogated to all the rights of the mortgagees in respect to any payments made by it, its right to foreclose for interest payments which it has accordingly made cannot be denied on the ground that, as it would still remain bound on its guarantee. it would have the right to further foreclosures for future payments. Any purchaser at the fore-

closure sale would be presumed to take this into account, and make provision accordingly.]

[4. A railroad company which guaranteed the bonds of another company, with a right of subrogation to the mortgage lien, further agreed "either to furnish equipment for the operation of said road, or to lease and operate the same on terms to be agreed upon between them." Held, that this stipulation could not be construed as a contract to lease for a rental sufficient to pay the interest on the guaranteed bonds.]

[5. The mortgagor company, having afterwards commenced a branch line and issued bonds upon it, made an additional contract with the guarantor company, containing the provision that, "with regard to the lease of said branch, it shall be used and operated * * * in the same manner and on the same terms as the main line." Held, that this referred merely to leasing and operation, and did not include an agreement to guarantee the branch line bonds.]

[6. The executive committee of a railroad company appointed a subcommittee of two to "agree upon the basis of a contract" for a running arrangement with another road, and report the same. Acting with a similar committee of the other road, the subcommittee accordingly agreed upon the terms of a perpetual lease. When this agreement was made, a third member of the executive committee was present and assented to it. He, with the two members of the subcommittee, constituted a majority of the executive. The contract, however, was subsequently rejected by a majority of the executive committee. Held, that such mere presence and assent did not make the agreement binding, and it never became a valid contract.]

[7. The R. Railroad Company, which had made an agreement to lease and operate a new road to be built by another company, was made the custodian of the latter's bonds and funds, which were to be paid out on the certificates of its chief engineer. Subsequently certain bondholders of the latter company sought to hold the R. Company liable on the ground that it was bound to see that the funds were properly applied, and that it had permitted them to be wasted and dissipated by extravagant construction contracts. It appeared, however, that the R. Company, after taking possession of the road, had, out of its own means, placed it in first-class condition. Held that, as the mortgage lien covered the road as thus improved, the bondholders were not injured, and their claim must fail.]

[8. Neither the officers nor directors of a railroad company have any authority to bind the company to supervise the construction of a railroad for another company, or to make it responsible for wasteful and extravagant expenditures in connection therewith.]

[9. The officers and directors of a railroad company cannot bind the company, by mere parol declarations and promises, to guarantee the bonds of another company; nor will the company be liable for any false representations or declarations of its individual officers or employees, in connection with sale of such bonds.]

[This was a foreclosure suit, brought by David Dows, Frederick S. Winston, and Calvin F. Burnes, trustees, against the Chicago & Southwestern Railway Company and the Chicago, Rock Island & Pacific Railroad Company. To this bill, Franz A. Muller, George Van der Kors, and Edward C. Boissevain Danielzoon were, on their own intervening petition, made parties defendant. The Chicago & Southwestern Railway Company filed a cross bill against all other original parties, and the Chicago, Rock Island & Pacific Company did the same. The inter-

[1] [Affirmed in 94 U. S. 444.]

venors filed a cross bill against all the other parties.]

OPINION OF THE COURT. On the 25th day of September, 1869, two railway companies, which had been organized under the laws of Iowa and Missouri, were consolidated under the name of the Chicago & Southwestern Railway Company. This company undertook to build a railroad from the Washington Branch of the Chicago, Rock Island & Pacific Railroad to the Missouri river opposite the city of Leavenworth. The Rock Island Company being interested in the projected road, as a feeder to its own roads, on the 1st day of October, 1869, entered into a contract with the Southwestern Company, by which, in order to aid the enterprise, the Rock Island Company agreed, on certain terms contained in the articles of agreement, to guarantee the payment of the principal and semi-annual interest of the bonds of the Southwestern Company to the amount of five millions of dollars, ($5,000,000.) This contract, among other things, provides that the Southwestern Company will enter into a contract with the Rock Island Company for the equipment, or the equipment and operation, of said road upon terms to be mutually agreed on between them, or will lease its line, franchises and property to the Rock Island Company at the option of said last-named company, and further "that when said road is completed and ready for operation," said Rock Island Company "agrees either to furnish equipment for the operation of said road, or to lease and operate the same on terms agreed upon between them." It was further provided that if default should be made by the Southwestern Company in the payment of the bonds or coupons above mentioned, or any part of either, and the said Rock Island Company should be required to and should pay the same, or any part thereof, that, as between the said parties, said payment should be held to be an advance of money upon the mortgage securing said bonds and coupons, and said Rock Island Company should receive all such bonds and coupons, and hold the same against said Southwestern Company unsatisfied and uncanceled, and should be subrogated to all the rights of the original holders thereof, and entitled to the lien and security of said first mortgage as against said Southwestern Company, and every other person, firm, or corporation, except the holders of outstanding bonds and coupons, and should have the right to foreclose said mortgage, and collect the said bonds and coupons so held by it, and sell all the property covered by said mortgage, subject only to the outstanding bonds and coupons secured by said mortgage; it being the intention of both parties that said first mortgage should stand as a security to said Rock Island Company, in the nature of a second mortgage of all the property of said Southwestern Company described therein, as against the holders of outstanding bonds and coupons, and as a first mortgage against all and every other person or persons, firms or corporations. On the 6th day of October, 1869, the Southwestern Company, in pursuance of said contract, executed to the complainants in the original bill, as trustees, a mortgage to secure the $5,000,000 of bonds referred to. This mortgage, reciting the terms of the agreement of October 1st, provided for the subrogation of the Rock Island Company, as in said agreement stipulated, and for the foreclosure of the mortgage at the written request of the Rock Island Company to the trustees, upon the happening of the contingency specified. The Rock Island Company indorsed the bonds in pursuance of this agreement. The Chicago & Southwestern Company having made default in the payment of the coupons when due, the Rock Island Company paid and took them up from November 1, 1871, to May 1, 1875. On the 25th of November, 1870, a company was organized in Missouri to build a branch road from Atchison, Kansas, to the main line of the Southwestern road, and on the 31st of May, 1871, this so-called Atchison Branch Company was consolidated with the Chicago & Southwestern Railway Company under the latter name. On the 1st of June, 1871, this consolidated company executed a mortgage to the same trustees—these complainants—to secure its bonds to the amount of one million of dollars, ($1,000,000,) to be used in building the Atchison Branch. This mortgage made the branch bonds a first lien on the Atchison Branch and a second lien on the main line. On the 27th of July, 1871, the Rock Island Company and the Chicago & Southwestern Company entered into a second contract in writing, which, reciting the fact of the execution of said branch bonds and mortgage, provides that it is agreed by and between the said companies that "with regard to the lease of said branch it shall be used and operated by said Chicago, Rock Island & Pacific Railroad Company in the same manner and on the same terms as the main line of the Chicago & Southwestern Railway Company." The construction of the main line commenced in December, 1869, and was finished in September, 1870. The construction of the branch was commenced in July, 1870, and was not completed till the latter part of September, 1871. The branch bonds and mortgage were issued to raise money to complete the branch road. The Rock Island Company took possession of the main line and branch roads as fast as they were built and fit for operation. The evidence shows that the Rock Island Company took possession by arrangement with the Southwestern Company, without any definite agreement or understanding as to the terms or rental on which it should operate the road, or as to the length of time it should continue in possession. The Rock Island Company,

when it took possession, found the roads in an unsafe and unfinished condition, and expended the sum of $1,271,936.46 in repairs and betterments, thus making, of both the main line and branch, "first-class western roads." The company also expended for operating the roads the sum of $1,489,152.63, and it received, as the earnings of the road, the sum of $1,420,089.09. The Southwestern Company, through Frank & Gans, bankers in New York, negotiated the branch bonds in Europe, and the defendants, Muller, Van der Kors and Danielzoon, became and are the owners and holders of these securities, to the number of 392 bonds, of $1,000 each. On the 4th of December, 1871, a subcommittee, appointed by the executive committee of the Rock Island Company, made to a committee on the part of the Southwestern Company a "certain counter proposition" containing "terms for a lease." This proposition was accepted by the committee of the Chicago & Southwestern Company. Among many other stipulations, it provides that the Rock Island Company shall lease both the main line and branch roads for a period of 999 years, furnish all equipments, pay all taxes and assessments, keep the road in good repair, and operate it for 65 per cent. of the gross earnings. On the 5th of February, 1872, the executive committee of the Rock Island Company rejected this contract, refusing to ratify it, by a tie vote.

The relief prayed by the parties may be stated as follows: Dows, Winston, and Burnes, as trustees, filed the original bill in compliance with the request of the Rock Island Company, made under a provision of the main-line mortgage seeking a foreclosure as to the main line, subject only to the rights of the holders of the main-line bonds and coupons outstanding. The Southwestern Company does not resist the foreclosure, but files a cross bill praying an accounting with the Rock Island Company, and that the alleged contract of December 4, 1871, be canceled. The Rock Island Company admits the allegations of the original bill, denies any indebtedness to the Southwestern, and by cross bill joins in the prayer of the original bill, prays an accounting with and decree against the Southwestern Company, and also attacks the contract of December 4, 1871, as null and void. Muller, Van der Kors, and Danielzoon, the intervening bondholders, ask for alternative relief upon two theories of fact. One of these theories seems to be that the Rock Island Company has undertaken, by contract, to guarantee substantially the whole bonded debt of the Chicago & Southwestern Company by virtue of a perpetual lease, binding that company to pay a rental sufficient to meet the semiannual interest upon the bonds of both the main line and the Atchison Branch. The intervening bondholders therefore pray that the Rock Island Company may be required to specifically execute a lease of the South-

western Railroad, including the Atchison Branch, upon the terms contained in the paper known as the "contract of December 4th." The other theory upon which they proceed is that, by reason of the misconduct of the Rock Island Company as trustee or custodian of the proceeds arising from the sales of the bonds of the Southwestern Company, it has become liable to the holders of said bonds for the amount of principal and interest due and to become due thereon, and should be decreed to pay the par value of the same, or at least should be postponed to the bondholders; and the corresponding prayer is that it be decreed to make such payments. Thus it is apparent that the real controversy in the case is between the Rock Island Company and the intervening bondholders. And it is evident that, if there be a decree of foreclosure, there can be no decree for the specific performance of the contract set up by the intervening bondholders for a perpetual lease; and the converse of this is true,—if there be a decree for the specific performance there can be no foreclosure. The one precludes the other. The questions of lease and foreclosure must therefore necessarily be considered together. A decision in favor of the one determines the other adversely. But it is equally clear that the complainants' prayer for a foreclosure might be granted, and yet a decree be rendered in favor of the intervening bondholders upon their claim for indemnity against the Rock Island Company growing out of its alleged breach of trust.

The controversy may therefore be resolved into two questions: First. Are the complainants entitled to a decree of foreclosure? This necessarily involves the question of specific performance. Second. Are the intervening bondholders entitled to a decree for indemnity under their prayer for alternative relief?

It thus appears that the Rock Island Company, as surety for the $5,000.000 of main-line bonds, assumed a vast responsibility. It was but natural that it should seek to secure itself against this liability by all the means in its power. One means of indemnity was its right to foreclose the mortgage in the event of its being compelled to pay the semiannual coupons. But this would manifestly have been imperfect security. It was probably supposed by the parties that the net earnings of the road would be sufficient to meet the semiannual interest. This, however, would depend upon the manner in which the road should be operated. The earnings of the road, if managed with skill and economy, would prove an additional security to the Rock Island Company; but the road might be unskillfully used, or the earnings misapplied, and in that event the Rock Island Company might have to look to the mortgage alone for security. And this clearly explains the reason for the provision in the contract of October 1. 1869, giving to the

Rock Island Company the option to lease the road on such terms as might be agreed upon. That clause gave the Rock Island Company the right, at its election, to lease and operate the road, and thus to make its resources available for the payment of the coupons. It was therefore specially and primarily intended as an additional security to that company, as guarantor of the bonds. It was not specially intended for the security of the bondholders, who were to be amply protected by the guaranty upon their bonds. But, surely, it was not intended that this optional right to lease should, as counsel contend, debar the Rock Island Company from its right to foreclose the mortgage upon payment of the coupons. Who could foretell, when the contract of 1869 was made, what the earnings of the road might or might not be? Who could then safely predict that the earnings would not, as the sequel proved, fall short of paying for repairs and running expenses; in which event, if the Rock Island Company could not, by reason of its lease, foreclose the mortgage, it would be without any remedy whatever till the maturity of the bonds at the expiration of thirty years? That company would then, after having paid the semiannual coupons for thirty years, have the privilege of foreclosing the mortgage for the $5,000,000 of bonds, with the interest compounded and accumulated. This construction would make the privilege of leasing the very opposite of an additional security to the guarantor.

It is evident that if the Rock Island Company had elected to lease the road at a rental agreed upon with the Southwestern, it would have been the duty of the former to apply the rental faithfully to the payment of the coupons. If the stipulated rental had been insufficient to pay the coupons, it would have been the duty of the Chicago & Southwestern to provide the balance required; and if the Southwestern had failed in this, leaving the Rock Island Company to pay the balance due upon the coupons, the right to have the mortgage foreclosed would have accrued to the guarantor. If the Rock Island Company took possession of and operated the road under any arrangement whatever with the Southwestern, without any agreement or understanding as to rental, it is evident that the former must account for the use of the road on the basis of a reasonable rental to be determined by the net earnings; and, in that case, it would have been the duty of the Rock Island Company to apply such reasonable rental to the payment of the coupons. The Rock Island Company was bound to operate the road with reasonable skill and economy, and apply the rental or net earnings faithfully to the payment of the semiannual interest. And if it were shown that the Rock Island Company failed to exercise reasonable skill and diligence in operating the road, or failed to make the proper application of the rental or net earnings, a substantial ground would exist in equity to refuse it a foreclosure. This ground does not, however, seem to exist. It is not relied on by the branch bondholders. It was manifestly the interest of the Rock Island Company so to operate the road as to make its available income as large as possible. In the absence of any showing to the contrary, we are bound to presume that the Rock Island Company did operate the road so as to make it produce all that it reasonably would, and the result shown is that the earnings were not sufficient to pay the running expenses.

Since the intervening bondholders do not rely upon any alleged delinquency of the Rock Island Company in running and operating the road. or in appropriating the proceeds, as a reason for refusing a foreclosure, what are the substantial grounds upon which they claim that the court should deny this relief to the guarantor?

First. The intervening bondholders complain of the alleged misconduct of the trustees, and insist that these proceedings have been instituted by collusion between the trustees and the two railroad companies. I see no sufficient evidence of any misconduct on the part of the trustees, or of the alleged collusion. At all events, the intervening bondholders are now fairly before the court, and, whatever may have been the motives for commencing the suit, the intervening bondholders cannot be injuriously affected thereby. The mala fides and collusion complained of, if they existed, have at all events failed of their alleged purpose, since the branch bondholders are now here, by their own request, and under the protection of the court. which is competent to secure to them their just rights and equities.

Second. The intervening bondholders insist that the cross bills filed by the two railroad companies, and all the proceedings in reference thereto, are irregular and invalid, since the intervening bondholders, having been by order of the court made parties to the original bill, were necessary parties to the cross bills. The intervening bondholders applied, by petition, to be made parties to the original bill, and the court granted all they asked. The cross bills had been filed and were then pending. The intervening bondholders did not ask to be made parties defendant to the cross bills. and it is their own fault if they were not made defendants. The court would doubtless have granted their petition if they had so framed it as to be made parties to the cross bills. But, in truth, whilst the intervening bondholders would have been proper parties to the cross bills they cannot be said to be necessary parties. The trustees of the branch mortgage are defendants to the cross bills. These trustees represent the bondholders. Regularly. indeed, the trustees of a railroad mortgage are the only necessary parties to a bill for foreclosure, since they

represent the interest of all holders of the bonds and coupons. It is, in general, impracticable to make the numberless holders of bonds and coupons all over the world parties defendant. The court, for special reasons, granted the prayer of the intervening bondholders to be made defendants in this case, but what is to prevent the branch bondholders from making their defense, whatever it may be, to cross bills in the name of their trustees? Surely the court would not deny them a hearing, and would not permit their trustees to obstruct them in making any proper and legitimate defense to the cross bills. The court would know how to deal with trustees who should attempt to deny to parties, whose interest they represent, the fullest opportunity to be heard in defense of their just rights.

Third. The intervening bondholders insist that the bill should be dismissed, because it shows that the suit is brought not to foreclose either of the two mortgages, main-line or branch, but to enforce a lien which is given by the main-line mortgage, etc. Now, the main-line mortgage gives the right of foreclosure to the guarantor upon its payment of the semiannual coupons; but the theory of the branch bondholders would exclude this right till the maturity of the bonds, a period of thirty years. A foreclosure is the appropriate relief in equity upon default in the payment of money secured by mortgage. The parties have expressly agreed to this remedy; the court cannot refuse it unless some insuperable obstacle stands in the way of granting it. I see no such obstacle. It is said that there can be but one foreclosure; that the Rock Island Company will remain bound for the future instalments of interest; that they cannot have additional foreclosures; and that the purchaser will take all the interests of all parties subject to the outstanding coupons and bonds. We are not now particularly solicitous about the purchaser at the foreclosure sale. Whoever he may be, he must take care of himself. No one will be compelled to purchase, but if any one shall purchase the property he will take it with full knowledge that his rights are subordinate to the outstanding bonds and coupons. He will acquire by the sale the whole interest of the Chicago & Southwestern Company, with the right to possess and operate the road. He will certainly know that the interest must be provided for and the bonds paid at maturity, and that if not paid, the bondholders or their guarantor, subrogated to their rights, as the case may be, will have the undoubted right to enforce payment by foreclosure. What possible difference could it make to a purchaser whether another and future foreclosure for nonpayment should be effected at the instance of the bondholders themselves or their guarantor? The purchaser, to save himself from a foreclosure, must see that the coupons and, finally, the bonds are paid.

Fourth. We come now to the principal ground on which the branch bondholders seem to rely to defeat the foreclosure. They contend that the Rock Island Company undertook to lease the Southwestern Company's road at a rental sufficient to pay the semiannual interest; that in pursuance of this undertaking that company took possession of the roads, both main line and branch, and that it has continued to use and operate them to the present time. The branch bondholders insist that if the Rock Island Company had fulfilled this agreement there would have been no default in the payment of interest and no ground in equity for a foreclosure. They seek to deduce the fact of this alleged undertaking from the terms of the contract of October 1, 1869, which they allege was extended to the branch bonds by the further contract of July 27, 1871. They also rely upon the alleged contract of December 4, 1871, which they insist was but the consummation of what had been previously agreed upon and understood. Now, if it was the intention of the parties to the contract of 1869 that the Rock Island Company should lease the road at a rental sufficient to pay the semiannual coupons, why was not that intention expressed? Why was language expressive of a totally different meaning incorporated in the instrument? The language of the contract is that the Rock Island Company shall furnish equipment for the road, or lease it on terms agreed upon by the parties. This, it must be admitted, leaves the matter of rental, as to amount, wholly indefinite and uncertain. Why did the contract not provide in terms that the Rock Island Company should lease the road at a rental sufficient to pay the semiannual interest, if that was the intention of the parties? How are we to account for the fact that intelligent parties, acting doubtless with the advice of counsel, after having agreed to a clear and definite stipulation as to the amount of rental to be paid, failed to incorporate their meaning in apt terms in their contract, but left a matter of such vital importance vague and obscure, and only to be deduced inferentially? The Jew Shylock, whatever else may be said to his discredit, displayed some conception of the law of contracts when, upon being told by Portia, the "wise young judge," to have a surgeon at his own charge to stop Antonio's wounds, lest he bleed to death, exclaimed: "Is it so nominated in the bond?" The contract and mortgage of 1869 declare in the clearest terms that the bondholders shall have the right to foreclose upon the nonpayment of the interest, or any part thereof, and these instruments provide that if the Rock Island Company shall pay the coupons, they shall be subrogated to all the rights of the bondholders, and shall be entitled to a foreclosure of the mortgage. But the branch bondholders repeatedly affirm, in the course of their argument, that the Rock Island Company, even though compelled to pay the cou-

pons, shall not, according to their interpretation of the mortgage and agreement, be entitled to have the mortgage foreclosed until the maturity of the bonds, a period of thirty years. Here, it must be confessed, is a direct contradiction in terms. According to the ingenious theory of the intervening bondholders, as expounded in their argument, the Rock Island Company, though not receiving a dollar from the road above running expenses, must go on paying the semiannual interest for thirty years without any right to proceed upon the mortgage; and this upon the assumption that the Rock Island Company have undertaken to pay a rental equal to the semiannual interest. According to this interpretation of the contract and mortgage, the Rock Island Company will, at the close of thirty years, have the privilege of foreclosing the mortgage for the five millions of bonds, with the compound and accumulated interest. Clearly the Rock Island Company would not have entered into such a contract as this, unless it was ready and willing to guaranty that the earnings of this projected road would be sufficient to pay running expenses, repairs, and the semiannual interest. And who can believe in the absence of explicit and unmistakable terms, that the Rock Island Company would, when the contract in question was signed, with all the uncertainties then before them, have assented to so improvident a contract, founded upon an assumption as to earnings not justified by the experience of western roads? If a rental was to be paid by the Rock Island Company sufficient to pay the coupons as they became due, how is it that the parties to the agreement and mortgage of 1869 provided, in these instruments, that the Rock Island Company, if it paid the interest, should have a right to foreclose the mortgage? In such case default in the payment of the coupons could only have happened by the failure of the Rock Island Company to pay the stipulated rental; in other words, the Rock Island Company would, under such contract, have had in its hands at all times money enough due to the Southwestern Company as rental to provide for the semiannual interest. Why then provide that if that company should pay the coupons it might foreclose the mortgage? Was the Rock Island Company, according to the contract, as expounded by the branch bondholders, to pay the coupons out of money due to the Southwestern Company, and make that payment the gravamen of a suit against the Southwestern and a ground of foreclosure?

Having thus disposed of the contract of 1869, and seeing its true character, let us next consider the contract of July 27, 1871. The intervening bondholders contend that by this contract the parties intended to extend the contract of 1869, including virtually and substantially, if not in terms, its express guaranty, to the Atchison Branch bonds. If such was their intention, it is remarkable that they did not express it in the contract. The language actually used in the contract of July 27, 1871, seems to have been carefully chosen for the purpose of limiting the extension of the contract of 1869 to the leasing and operation of the road by the Rock Island Company The language itself clearly excludes the guaranty. The terms are that, "with regard to the lease of said branch, it shall be used and operated by said Chicago, Rock Island & Pacific Railroad Company in the same manner and on the same terms as the main line," etc. Now, if we confound the two stipulations of the contract of 1869, —if we hold that the contract to lease in that instrument is precisely equivalent to the undertaking to guarantee the bonds,—the construction sought to be placed upon the contract of 1871 is, perhaps, correct. But why should we go outside of the terms of an instrument seeking alien constructions, when it has a plain and obvious meaning? Are we to assume that the parties did not understand the import of the terms they used? Do they say, generally, that the agreement of 1869 is extended to the branch bonds, or that the agreement with respect to both the guaranty and lease are so extended? Not so. On the contrary, the language clearly implies that with "regard to the lease" the contract is so extended, and by irresistible implication that the guaranty is excluded.

But the intervening bondholders insist that their construction of the contract of July 27, 1871, is illustrated and enforced by the facts and circumstances in evidence, by the conduct of the parties, and, especially, by the oral declarations of Mr. Tracy to Mr. Frank. It is beyond question that the branch bonds were not in fact indorsed with the guaranty of the Rock Island Company, as the bonds of the main line had been, and that they were accepted by the bondholders without that indorsement. It is also a fact that no one ever claimed, or asked, or demanded, that the branch bonds should be so indorsed under and by virtue of the contracts of 1871 and 1869. Some of the main-line bonds were negotiated without this indorsement prior to the execution of the alleged contract of December 4, 1871. It was agreed by that contract that the bonds which had been already sold should be exchanged for new bonds, which the Rock Island Company was to indorse. It is clear that up to this time no one claimed that the Rock Island Company was under any obligation to indorse the branch bonds as they had done the main-line bonds. It is in evidence that after the alleged agreement of December 4th, and while it was supposed that the Rock Island Company would, in pursuance of its terms, indorse the branch bonds, they were regarded by all parties as a much more valuable security than they had been before. The value of the branch bonds, as fixed before the contract of December 4, 1871, was 80 cents on the dollar; whereas the main-line bonds, with the Rock

Island Company's indorsement, were worth 90 cents on the dollar. Why this difference in the market value of the bonds, if it was understood that the Rock Island Company was, in fact if not in form, bound, under the contracts of 1869 and 1871, to pay the semiannual interest on both classes of securities? What construction could dealers in these securities have put upon the fact that one class of bonds bore upon their face the guaranty of the Rock Island Company, and the other class did not, except that the Rock Island Company intended to become responsible for the main-line but not for the branch bonds? And, if it was understood by the parties interested that the Rock Island Company was bound by contract to pay the semiannual interest upon the branch bonds, why did they not require some writing—some express undertaking—to that effect? Was such a thing ever heard of before, as that a set of astute capitalists, who considered themselves entitled to the security of a responsible indorser, should advance a million of money without requiring any express or written undertaking from their guarantor? Who can believe that these bankers and capitalists would have been content to rest upon the mere oral declarations or promises of parties assuming to represent the guarantor, or upon vague inferences drawn from contracts not directly connected with the loan?

Again, the branch bondholders seem to place great reliance upon the declarations of Mr. Tracy to Mr. Frank prior to the execution of the contract of July 27, 1871, and prior to the negotiation of the branch bonds. Mr. Frank testifies that he told Winston, Burnes, and Courtright, who represented the Southwestern Road, that he had no objection to negotiate the branch bonds if they could get the guaranty of the Rock Island Company on the bonds. "They answered that it would be hardly possible to get that, because Mr. Tracy had stated that his stockholders were dissatisfied with his guaranteeing any bonds,—any more bonds; but they said that the road would be leased and the interest on the bonds taken care of by the Rock Island road. I answered that if they could get me such a writing as that, or to that effect, I would negotiate the bonds." Shortly after this Mr. Frank met Mr. Tracy, and mentioned the facts of this Atchison Branch negotiation: "Told him that the parties wanted him (Frank) to sell these bonds; he seemed to know of the scheme, and I asked him if he would guarantee those bonds. He said 'No, because his stockholders were not satisfied with his guaranteeing any bonds.' That was about the substance." Frank then asked him, "'Will you lease the road when it is finished, and take care of it the same as the main line?' He said, 'I see no objection to that.' I asked him, 'Will you give that as the president, or as the company, for the company?' He said, 'Yes,' and

he did." What the witness means by the words "and he did" was that Mr. Tracy made with the Southwestern Company the contract of July 27, 1871, which was brought to him (Frank) by Winston or Burnes, before he negotiated any of the branch bonds.

Now, it is evident that Mr. Tracy here makes a clear distinction between the obligation to guarantee the bonds and to lease and operate the road and take care of it the same as the main line; and we have just seen that the same distinction clearly appears in the contract of July 27, 1871. Now, this is a distinction without the least substantial difference, if it was understood that Mr. Tracy was to lease the road at a perpetual rental sufficient to pay the semiannual interest, and that he was thus to pay the coupons as they matured. What must the bondholders have understood from Mr. Tracy's language, if truthfully reported to them by Mr. Frank? Why, certainly, that he made a broad distinction between guaranteeing the bonds and leasing and taking care of the road the same as the main line. He would not guarantee, but he would lease. What did that distinction import? From this could the bondholder have justly concluded that although the Rock Island Company, by the mouth of its president, expressly refused to guarantee the bonds, yet that the company would substantially guarantee by taking a perpetual lease of the road at a rental sufficient to pay the interest? No. They must have understood Mr. Tracy's language in its natural and obvious import, namely, that the Rock Island Company would lease, operate, and take care of the branch line under the same arrangements, which should be made applicable to the main line, whatever those arrangements might be. Not one word was said by Mr. Tracy as to any definite contract for the rental of the road, or any definite sum to be paid. By what forced interpretation of language can Mr. Tracy's words be made to imply that the Rock Island Company would lease the road at a rental sufficient to pay the interest upon the bonds, or at any fixed and definite rental whatever? What possible difference would it make to Mr. Tracy's stockholders, whether he directly guaranteed the bonds, or made an arrangement, by which they would be bound, after paying for repairs and running-expenses, to pay a rental, upon a perpetual lease, sufficient to liquidate the semiannual interest?

We come now to the consideration of the alleged contract of December 4, 1871. I deem it unnecessary to go into the interesting legal questions, so ably discussed by counsel, touching the validity of this supposed contract. Whether or not its material provisions were, as to the Chicago & Southwestern Company or the Rock Island Company, ultra vires, is, in my view, unimportant, since it is clear, upon the facts, that it was not a consummated contract. What are

the facts? The executive committee of the Rock Island Company, on the 30th day of October, 1871, passed a resolution appointing "William L. Scott and Hugh Riddle a subcommittee to agree upon the basis of a contract for a running arrangement between the Rock Island and the Southwestern Companies, and when so agreed upon to report to this committee." Manifestly, this subcommittee had no power whatever to consummate any contract binding upon the Rock Island Company. It were an idle waste of words to discuss so plain a proposition as this. The subcommittee, however, did, as they well might, on the 4th day of December, 1871, agree with a similar committee on the part of the Southwestern Company upon the basis of a contract. They did this clearly and unquestionably in their capacity of subcommittee, and by no authority whatever, except the resolution by which they were appointed. Mr. Riddle and Mr. Scott signed their names to the proposed agreement in their capacity as a committee, and in due time they reported their proceedings to the executive committee. By that body this proposed agreement or basis was rejected. By a tie vote the executive committee refused to ratify what their subcommittee had agreed to or proposed and reported to them. Upon this statement of facts, no possible doubt could be entertained that there was no consummated contract; in other words, no contract at all between the two railroad companies. But the bondholders rely upon the fact that Mr. David Dows, a member of the executive committee, was present when the contract in question was agreed to, and that he assented to the agreement. Hence they say a majority of the executive committee assented to the contract, and a majority had power to make a contract binding upon the Chicago & Rock Island Company. In what capacity Mr. Dows was present does not clearly appear. He did not sign the paper with the other members of the committee, and hence it is to be inferred that he did not assume to act as a member of the committee. He may have been casually present, or intentionally present, for the purpose of aiding the subcommittee with his opinion and advice. At all events, it does not appear that he was present in any official or corporate capacity whatever. But it is beyond doubt or question that Mr. Riddle and Mr. Scott were then and there acting in their capacity as a subcommittee, and that Mr. Dows was not a member of the subcommittee. How could Mr. Dows, by being present at a meeting of the subcommittee, change its character and authority, enlarge its powers, and, in a word, clothe it with the whole authority of the executive committee to make contracts binding upon the Rock Island Company? To state such a proposition is sufficient to dispose of it. It was clearly not intended that Mr. Dows, by his presence, should clothe the sub-committee with any such enlarged and plenary authority as is now claimed for it, since he did not sign the contract which it reported to the executive committee. He may have advised or assented to their action; but, if so, his advice and assent gave to the contract no greater validity than it would have had without his co-operation; nor would the result have been at all different if Mr. Scott and Mr. Riddle had acted, not in their capacity as a subcommittee, but as members simply of the executive committee. To say that a majority of a committee may meet, casually or intentionally, without notice to the minority, not at a time of any regular meeting, and without regard to any of the forms of the body to which they belong, and take resolutions binding upon the whole body of which they are members, is to assert a proposition without support in law or reason. Such a practice would ignore the rights of minorities, and deprive the constituent body of all the benefit, to which it is entitled, of the knowledge, experience, advice, and counsel of the minority in consultation and discussion. Clearly, any resolution of a majority so taken would not be the act of the committee in its organized form, but merely the individual act of the majority members. I am, therefore, of opinion that the prayer of the original bill for foreclosure should be granted, and that of the cross bill, for specific performance, denied.

Let us now finally consider the case presented by the intervening bondholders to maintain their prayer for alternative relief. This prayer is founded upon the allegation that the Rock Island Company committed a breach of the trust imposed upon it as custodian of the money raised on the branch bonds. It was provided in the branch mortgage that the bonds and proceeds should be delivered and paid over by the Rock Island Company, as custodian, upon the certificate of the chief engineer of the Southwestern Company, with the approval of the president of the Rock Island Company indorsed thereon. Hence, it is insisted that it was the duty of the Rock Island Company to supervise the expenditure of the money, and see that it was judiciously applied to the building of the road, and that, instead of performing this duty, the custodian permitted the money to be squandered and wasted dishonestly upon extravagant construction contracts. It is also alleged that the road was accepted in so unfinished and imperfect a condition that a large sum of money had to be expended to prepare it for use and operation. It is further said that the line was represented to the bondholders to be fifty miles in length, whereas it was in fact only about thirty miles long, and that in this the branch bondholders were grossly defrauded. These frauds, it is contended, could not have been consummated if the trustee of the fund had faithfully performed its duty as prescribed

in the branch mortgage. With respect to the line of the Atchison Branch road, it may be remarked that there is no provision in the branch mortgage, as there is in the contract of October 1, 1869, which, by the recitals of the main-line mortgage, became a part of it, giving to the Rock Island Company any control of the alignment. The Rock Island Company, having indorsed the main-line bonds, reserved to itself the right to control the location and alignment of that road. Allowing, as true, all that is affirmed by the intervening bondholders with respect to the imperfect construction of the road, I cannot see that they have suffered any substantial injury, since it is shown that the Rock Island Company has, by repairs and betterments, paid for with its own means, made the Atchison Branch "a first-class western road," and it is conceded that the lien of the branch mortgage attaches to the road in its improved and bettered condition in preference to the Rock Island Company's claim for improvements. It is noticeable that by the terms of the branch mortgage the Rock Island Company is made custodian merely of the funds, and they are to pay or deliver upon the certificates of the chief engineer of the Southwestern Company with the approval of the president of the Rock Island Company indorsed thereon.

But at this point it may not be amiss to inquire: What is the Rock Island corporation? What are its functions? Who compose the corporate body? The president and directors are not the corporation. The corporate body must have existed before its officers or agents were chosen. If every one of these should be killed by lightning in a moment, the corporators who elected them would still live. Manifestly, the stockholders constitute the corporation. They put their money into it. They own the stock and property of the corporation. They alone take the profits and suffer the losses resulting from its business. They keep the corporation alive or put an end to its existence. In a word, they are the constituent body, the life, the soul of the incorporeal body, and under the law they are the final source of all power and authority. The president and directors cannot therefore bind the corporation to anything and everything and by every manner of means. Their power is derivative, and, like all persons exercising delegated power, they must, to bind their principal, keep within the scope of their authority. The president and directors of a railroad company could not, with the money of the corporation, purchase stock in a manufacturing company. They could not commit the stockholders to the building of a canal. They could not engage the company in the banking business, accept money on deposit, deal in exchange, and thus make the stockholders, to the extent of their stock, responsible for losses.

Now, in the present case the Chicago & Southwestern Company saw fit in the branch mortgage to provide that the Rock Island Company should be the custodian of its bonds and money; and it is contended that this mortgage committed the Rock Island Company to the duty of supervising the contracts, the alignment and the construction of the Atchison Branch road. Was it cognate to the ends and purposes of the Rock Island Company's organization to become the trustee and custodian of the funds of another road, to supervise its construction contracts and alignment, and to superintend, from a vast distance, its actual construction, its building material, its stone, timber, and mortar? Had the president and directors the right to commit their stockholders, without their consent, to this vast responsibility, and make them liable for losses growing out of it? Doubtless the treasurer, Mr. Tows, who received the money as custodian, became responsible as an individual for its safe keeping and disbursement; and perhaps, if Mr. Tracy undertook to supervise the construction and alignment, he, as an individual, may have become responsible for a faithful execution of that trust; but, in my judgment, neither Mr. Tracy nor the whole directory had any authority to bind the stockholders without their assent to duties and responsibilities so extraordinary and so alien to the business of the corporation. And, in my view, the same principle applies with even greater force to the declarations, admissions, and representations of individual members and officers of a corporation made beyond the scope of their authority and outside of the corporate business. The stockholders, the real corporators, are not bound by such declarations and admissions. It seems to be supposed that whatever Mr. Tracy may have said or promised anywhere, and about anything, was sufficient to commit the corporation to the greatest and most onerous responsibilities. If this were law, there would be no safety for the stockholders of any corporation whatever. There seems to be no sufficient evidence in the case that any of the officers of the Rock Island Company were privy to the false representations upon which it is alleged the branch bonds were negotiated. But what if they were? Had any individual officers or directors, or the whole directory, any power whatever to bind the stockholders of the Rock Island Company, without their own consent, to any guaranty of another road's bonds, even if they had assumed to do so by the most solemn written forms, much less by mere oral declarations, "without form and void"? Are the stockholders of the Rock Island Company to be made responsible for the payment of millions of money by the floating declarations of its individual officers and employees? Would any prudent money lender—and what money lender is not prudent—have accepted and relied upon such evidence as a basis for loaning large sums of money? Is this the kind

of evidence on which vast loans are negotiated by financiers and capitalists? To hold any corporation bound by the somewhat slippery doctrine of estoppel to the extent claimed in this case would, in my judgment, be carrying that doctrine to an extravagant length. By such an application of the doctrine of equitable estoppel the staunchest corporation in the land might any morning find itself buried beyond hope under a huge mountain of oral obligations, "proved by parol."

For these reasons, I am of opinion that the prayer of the cross bill for alternative relief must be denied, and the cross bill dismissed.

[NOTE. The intervenors took an appeal to the supreme court, which affirmed the decree, Mr. Justice Strong delivering the opinion. The questions there discussed were, however, mainly jurisdictional, and the points made in the foregoing opinion were given little prominence. See Muller v. Dows, 94 U. S. 444.]